EAST COAST NOVELTY COMPANY, INC., Plaintiff,

v.

The CITY OF NEW YORK, The Police Department of the City of New York, Carl W. Wendt, Property Clerk of the Police Department of the City of New York, Police Officer Sandra Vazquez, Badge No. 24707, Police Inspector Frank Biehler, Police Legal Bureau Officer Karen Pakstis, Police Detective Mitchell Kolpan, a/k/a Eric Vitale, Assistant New York County District Attorney Robert Viteretti, Robert Morgenthau in his official capacity as District Attorney of the County of New York, State of New York and Police Lieutenant Michael Walsh, Defendants.

No. 90 Civ. 2108 (RWS).

United States District Court, S.D. New York.

Dec. 17, 1992.

Kahn & Sternberg, Rockville Center, NY, for plaintiff; Elaine H. Sternberg, of counsel.

O. Peter Sherwood, Corp. Counsel of the City of New York, New York City, for defendants; Lawrence Wolff, John P. Woods, Asst. Corp. Counsel, of counsel.

## OPINION

SWEET, District Judge.

Defendants City of New York (the "City"), Frank Biehler ("Inspector Biehler"), Karen Pakstis ("Officer Pakstis"), Mitchell Kolpan ("Detective Kolpan"), Robert Viteretti ("ADA Viteretti"), Robert Morgenthau (the "District Attorney"), and Michael Walsh ("Lieutenant Walsh") (collectively the "Defendants") have all moved for an order dismissing Plaintiff East Coast Novelty Company's ("East Coast") Amended Complaint, pursuant to Rule 12(b), Fed.R.Civ.P., or granting summary judgment against East Coast's claims, pursuant to Rule 56, Fed.R.Civ.P.

For the reasons set forth below, the Defendants' motions are granted in part and denied in part.

*Parties*

East Coast is a New Jersey corporation authorized to do business in the State of New York. Its principal office is in the City of Newburgh, New York, and its primary business is importing Class "C" fireworks.

The City is a domestic municipal corporation with full governmental authority, existing under the laws of the State of New York.

Inspector Biehler is an Inspector with the New York City Police Department ("Department"), who was the ranking officer in charge of the Manhattan South Public Morals Division. Officer Pakstis is an attorney and a member of the Department's Legal Counsel. Detective Kolpan was an undercover officer with the Department. Lieutenant Walsh is an Lieutenant with the Department.

The District Attorney is sued in his official capacity only. ADA Viteretti was an Assistant District Attorney in New York County until January 1991.

*Prior Proceedings and Facts*

The relevant proceedings and facts are fully set forth in the prior opinion of this Court, familiarity with which is presumed. *See East Coast Novelty Co. v. City of New York*, 781 F.Supp. 999, 1002–03 (S.D.N.Y. 1992) (the "Opinion"). The underlying events at issue concern the Department's seizure of the Plaintiff's entire inventory of fireworks in Newburgh, New York. East Coast appears to have been a properly licensed importer of fireworks and to have complied with the pertinent governmental authorities. The fireworks were seized as part of "Operation Skyrocket," initiated by the Department to attack the distribution of fireworks in New York City after two successive Fourth of July fireworks displays at the Bergen Hunt and Fish Club. After the fireworks were seized, a destruc-tion hearing was held. The confiscated inventory was ordered to be destroyed, and the fireworks were taken to the Department's Rodman's Neck facility where they were subsequently destroyed.

The Opinion narrows the Plaintiff's initial Complaint. The claims against the Department, the Department's Property Clerk's Office, and Sandra Vasquez were dismissed. East Coast's procedural due process claim against all the Defendants and its claim for punitive damages against the City were also dismissed. East Coast's § 1983 substantive due process claim, which is based on the execution of the search warrant and the seizure of the fireworks, and its state law claims survived. East Coast was also permitted to amend its complaint.

The Defendants moved to reargue their initial motion for summary judgment. The motion was denied on March 11, 1992. *See East Coast Novelty Co. v. City of New York*, 141 F.R.D. 245 (S.D.N.Y.1992).

East Coast served its Amended Complaint on the Defendants in April 1992.[1] It added claims against Inspector Biehler, Officer Pakstis, Lieutenant Walsh, the District Attorney and ADA Viteretti, and also enlarged the § 1983 claim to include an allegation of municipal liability based on the contention that the Department failed properly to train and supervise its officers.

On May 6, 1992, the Defendants filed the present motion. At the parties' request, the motion was taken on submission on July 1, 1992, with the final papers being submitted to the Court on October 2, 1992.

*Discussion*

The Amended Complaint sets forth claims under 42 U.S.C. § 1983 and state law. The Defendants seek to dismiss the § 1983 claims on a number of grounds and to dismiss one of the state law claims and parts of two of the remaining state claims. In the alternative, the Defendants seek an order granting summary judgment in their favor on these claims.

---

**1.** Sandra Vasquez appears to have been erroneously named in the Amended Complaint as a Defendant. The Opinion dismissed the claims against her on qualified immunity grounds. *See East Coast*, 781 F.Supp. at 1011.

## I. Legal Standards

■ In addressing the Defendants' motions, the following familiar standards must be kept in mind. First, a court should dismiss a complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure only if it appears beyond doubt that the plaintiff can prove no set of facts supporting its claim that entitles it to relief. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). The complaint's allegations must be construed in the light most favorable to the plaintiff and the plaintiff's allegations accepted as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dacey v. New York County Lawyers' Assoc.*, 423 F.2d 188, 191 (2d Cir.1969), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970).

■ Second, "[s]ummary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party. However, where the nonmoving party bears the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) (citations and internal quotation omitted). In sum, if in "[v]iewing the evidence produced in the light most favorable to the nonmovant, ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991); *see also Bay*, 936 F.2d at 116.

## II. Genuine Issues of Fact Preclude Summary Judgment

In the Opinion, the Court held that the Defendants' previous motion for summary judgment could not be granted because there are several material issues of fact that remain in dispute. These issues include the following:

(1) the amount of inventory was to be seized in the execution of the search warrant;

(2) whether Detective Kolpan told Louis Cinquegrana ["Louis"] that he intended to sell the fireworks he purchased from East Coast in New York City;

(3) whether the entire contents of the three bunkers was offered for sale to Detective Kolpan by Louis;

(4) whether the Department's conduct constituted municipal policy; and

(5) whether the Defendants' conduct in executing the search warrant and seizing East Coast's entire inventory was reasonable.

*See East Coast*, 781 F.Supp. at 1008–11.

In bringing these present motions to dismiss or grant summary judgment, the Defendants do not offer any evidence to support the conclusion that the Court's findings with regard to the materiality and disputed status of these issues were incorrect or are no longer valid. Therefore, to the extent that the Defendants' contentions rely on the immateriality and lack of genuine issue of fact with regard to these issues, those contentions must necessarily fail.

## III. Immunity to § 1983 Claims

In *Imbler v. Pachtman*, 424 U.S. 409, 416, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976), the Court noted the apparent breadth of § 1983:

Title 42 U.S.C. § 1983 provides that "(e)very person" who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages. The statute thus creates a species of tort liability

that on its face admits of no immunities, and some have argued that it should be applied as stringently as it reads. But that view has not prevailed.

Specifically, in *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951), the Court "established that § 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler,* 424 U.S. at 418, 96 S.Ct. at 989.

In the context of a summary motion judgment, the immunity at issue is "an *immunity from suit* rather than a mere defense to liability; and ... [it] is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). *Accord Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987). "Moreover, in the procedural context of summary judgment, factual allegations in the pleadings of the party opposing the motion ..., if supported by affidavits or other evidentiary material, should be regarded as true by the district court." *Washington Square Post #1212 v. Maduro,* 907 F.2d 1288, 1292 (2d Cir.1990).[2]

■ The Supreme Court recently reiterated the fact that the burden is on the official seeking absolute immunity to demonstrate that such immunity is justified in light of the official's function in question. *See Burns v. Reed,* — U.S. —, —, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547, 558 (1991); *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 542–43, 98 L.Ed.2d 555 (1988). The official must overcome the weighty presumption that, to the extent any immunity is applicable, "qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns,* — U.S. at —, 111 S.Ct. at 1936, 114 L.Ed.2d at 558; *see also id.* ("We have been 'quite sparing' in our recognition of absolute immunity and have refused to extend it any further than its justification would warrant.").

The question presented here is whether the defendants are shielded from this suit on East Coast's § 1983 claims by some form of immunity, be it absolute or qualified in nature.

## A. *ADA Viteretti's Assertion of Absolute Immunity*

When a state prosecuting attorney's "activities [are] intimately associated with the judicial phase of the criminal process, ... [they are] functions to which the reasons for absolute immunity apply with full force." *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995. In *Imbler,* the Court explicitly declined to reach the question of whether absolute immunity for § 1983 purposes extends to a state prosecuting attorney whose actions "cast him in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430–31, 96 S.Ct. at 995.

In *Burns,* the Court addressed one of the areas reserved in *Imbler,* refusing to extend the concept of "intimately associated functions" to include advising the police in the investigative phase of a criminal case. Applying the three-part test set forth in *Forsyth,* 472 U.S. at 521–23, 105 S.Ct. at 2812–14, the Court found: (1) there was no common-law support for such immunity; (2) the risks of harassing or vexatious litigation do not support absolute immunity for giving legal advice; and (3) the judicial process would not necessarily inhibit out-of-court activities of a prosecutor such as giving legal advice to the police. *Burns,* — U.S. at —, 111 S.Ct. at 1937, 114 L.Ed.2d at 563–65.

The Defendants rely on *Imbler,* asserting that ADA Viteretti is absolutely immune from suit under § 1983 because his functions in this case qualify as "intimately associated functions" which justify such immunity. The Defendants identify three distinct functions ADA Viteretti performed:

---

**2.** The Second Circuit has greeted with approval the determination of the issue of qualified immunity at the pretrial stage on a motion for summary judgment when "the factual record is

not in serious dispute." *See Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

(1) he drafted and obtained the search warrant for [East Coast's] Newburgh premises; (2) *subsequent to Louis Cinquegrana's ... arrest,* he, along with Karen Pakstis from Police Legal Bureau, after discussing what transpired with Insp. Biehler, advised NYPD that all the fireworks in [East Coast's] three bunkers were evidence of unlawfully dealing in fireworks and subject to seizure[3]; and (3) subsequent to the seizure of [East Coast's] fireworks, he represented the People at the destruction hearing.

Defs.' Mem. 6 (citations omitted).

### 1. The Search Warrant

 It is undisputed that, under *Burns,* ADA Viteretti is entitled to absolute immunity for the first function of drafting and obtaining the search warrant under whose color East Coast's inventory was confiscated.

### 2. Advising the Department

 The Defendants assert that ADA Viteretti's second function, that of advising the Department on jurisdictional issues and in executing the search warrant, also justifies absolute immunity. The Defendants arrive at this conclusion by noting that this function occurred subsequent to Louis' arrest and that the matter had, therefore, moved from the investigative stage to the post-arrest stage. From this chronological analysis it follows, according to the Defendants, that "Viteretti's actions were intimately associated with the judicial process in the furtherance of the prosecution of Louis[,] *i.e.,* the gathering of evidence and the decision concerning which county had jurisdiction to prosecute Louis." Defs.' Reply Mem. 3.

This analysis, however, misconstrues *Imbler* by replacing the traditional functional analysis, which focuses on the nature of

the official action in question, with a chronological analysis, which draws lines between phases of a criminal action, and misconstrue *Burns* by reading its holding too narrowly. In the Defendants' view, a state prosecutor is not absolutely immune for giving advice to the police regarding the execution of a search warrant before a suspect is arrested but is absolutely immune after the arrest. However, such a view vests the act of arresting of the suspect with a kind of transformative power and ignores the critical inquiry required by *Imbler* of identifying the *role* in which the prosecutor's responsibility cast him.

The question underlying the issue of absolute immunity is not the one posed by the Defendants: At what stage in the chronology of events did the prosecutor act? Rather, the appropriate question is: Into what *role* has the prosecutor's responsibilities cast him—that of an administrator, investigator, or advocate? *See Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995–96; *Burns,* —— U.S. at ——, ——, 111 S.Ct. at 1941, 1943–1944, 114 L.Ed.2d at 561, 563–64; *see also Forrester,* 484 U.S. at 229, 108 S.Ct. at 545 ("it [is] the nature of the function performed, not the identity of the actor who perform[s] it, that inform[s] our immunity analysis"); *Harlow v. Fitzgerald,* 457 U.S. 800, 810–11, 102 S.Ct. 2727, 2734–35, 73 L.Ed.2d 396 (1982) (the "functional" approach to immunity law extends absolute immunity only to judicial, prosecutorial, and legislative functions); *Schloss v. Bouse,* 876 F.2d 287, 289 (2d Cir.1989) (prosecutors "enjoy at most a qualified immunity with respect to acts that are 'administrative' or 'investigative' "). A determination of when the suspect was arrested is irrelevant to this latter inquiry.

The Defendants misconstrue *Burns* by mistakenly concluding from the facts on

---

**3.** ADA Viteretti's advice to the New York Police Department addressed two issues: one regarding jurisdiction, the other regarding the execution of the search warrant. The jurisdictional issue concerned Louis' arrest, and ADA Viteretti advised the Department that Louis should be brought before a Newburgh judge and released into the custody of the Department. With regard to the execution of the search warrant and

seizure of East Coast's inventory, ADA Viteretti advised the Department that East Coast's entire inventory could be seized as evidence of unlawfully dealing in fireworks because all the fireworks in the three bunkers had been made available to Kolpan for sale, and that the fireworks should be loaded into trucks and transported to the Department's Bomb Squad location at Rodman's Neck.

which that case was decided that a prosecutor can only act in an investigative role during the pre-arrest, investigative phase of a criminal case. In *Burns*, the prosecutor advised the police regarding the acceptability of hypnosis as an investigative technique before the suspect in a murder case was interviewed under hypnosis and regarding the likelihood of having probable cause to arrest the suspect based on statements she made while under hypnosis.

Although the Court stated it did "not believe ... that advising the police in the investigative phase of a criminal case is so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity," the Court's *Forsyth* analysis of this issue is couched in general terms of the act of providing legal advice to the police by the prosecutor, regardless of the stage in the criminal case at which that advice is given. *Burns*, —— U.S. at ——, 111 S.Ct. at 1941–43, 114 L.Ed.2d at 562–63 (citation and internal quotation omitted); *see also id.* at 563–65. Not surprisingly, this is consistent with the exclusively functional approach set forth in *Imbler*.[4]

In this case, after Louis' arrest, ADA Viteretti was flown by helicopter to East Coast's premises and assumed the role of advisor to the Department on the issues of jurisdiction and the scope of the search warrant as that warrant was being executed on the site of a large-scale departmental operation. His role was not that of advocate, and he is not, therefore, entitled to absolute immunity from suit arising from East Coast's § 1983 claim regarding the seizure of East Coast's inventory.

### 3. The Destruction Hearing

■ With regard to ADA Viteretti's third function, East Coast asserts that,

while he may qualify for absolute immunity under *Imbler* and *Burns* for his role at the hearing, he is only entitled to, at most, qualified immunity for his decision to apply to the Court for the destruction of the property. East Coast derives this conclusion from the claim that:

> [t]he destruction of this property was not conducted in accordance with any ongoing prosecution. Rather, Viteretti sought the fireworks' destruction to aid the police in its desire to rid the streets of fireworks before the Fourth of July.

Pl's. Reply Mem. 5. And East Coast relies on Justice Scalia's separate opinion in *Burns* for support of this proposition. *See Burns*, —— U.S. at ——, 111 S.Ct. at 1944, 114 L.Ed.2d at 565 (Scalia, J., concurring in part and dissenting in part).

In *Burns*, Justice Scalia concurred with the Court's holdings that a prosecutor has absolute immunity for his actions in a judicial hearing, and that a prosecutor has only qualified immunity for providing legal advice to police officers. *Id.* —— U.S. at ——, 111 S.Ct. at 1944, 111 L.Ed.2d at 565. However, Justice Scalia, joined by Justices Blackmun and Marshall, went on to address the question of whether a prosecutor has absolute immunity when he seeks a search warrant in a probable cause hearing. *Id.* —— U.S. at ——, 111 S.Ct. at 1948–49, 114 L.Ed.2d at 570. Addressing the first prong of the *Forsyth* test, Justice Scalia concluded that there is no common-law support for absolute immunity for this function, and he then relied on *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), and distinguished *Imbler* to conclude that the procuring of a warrant is *twice* removed[5] from the judicial phase of criminal proceedings. *Id.*

---

**4.** The Defendants could succeed on their assertion that Viteretti is absolutely immune for his second function only by distinguishing *Burns* from the facts at hand on a showing that the three prongs of the *Forsyth* test are satisfied once a suspect is arrested. But in light of the careful analysis in *Burns*, whose breadth covers the facts on this record, it is highly unlikely that the Defendants could make such a showing because it would require them to draw distinctions between roles in such an artificial manner

that would fail to demarcate any genuine differences in the natures of those roles.

**5.** In *Malley*, the Court found that the act of procuring an arrest warrant is *"further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment."* 475 U.S. at 342–43 (emphasis added). In light this conclusion, Justice Scalia noted that "[t]he act of procuring a mere *search* warrant is *further removed still."* *Burns*, —— U.S. at ——,

The Defendants respond to East Coast's claim by contending the majority in *Burns* held that "the prosecutor's decision to initiate the search warrant proceeding and the search warrant proceeding itself is one issue for which the prosecutor is entitled to absolute immunity." Defs.' Reply Mem. 4. The first half of this attributed holding, however, is false. The Court explicitly refused to address the issue of whether the prosecutor has absolute immunity for his decision to initiate the search warrant proceeding because it did not find any allegation of this kind in the plaintiff's claims. *Burns*, —— U.S. at —— n. 5, 111 S.Ct. at 1940–41 n. 5, 114 L.Ed.2d at 560 n. 5. The Court dismissed Justice Scalia's argument regarding the procurement of a search warrant on the ground that it was *irrelevant*, not wrong. *Id.*

The question, then, is whether Justice Scalia's argument is relevant to the matter at hand, and the answer is that it is not, because the destruction hearing here is distinguishable from the probable cause hearing in *Burns*.[6] The distinguishing feature here is simply that of the role played by the ADA Viteretti. In *Burns*, the prosecutor's role in seeking a search warrant in a probable cause hearing was investigative in nature, and thus it fell outside of *Imbler*'s nexus of "intimately associated functions." However, in deciding to initiate a destruction hearing after a search warrant has been executed and a suspect arrested, as opposed to advising the police on the execution of a search warrant, a prosecutor is functioning within his prosecutorial capacity and, therefore, qualifies for absolute immunity under *Imbler, Forsyth,* and *Harlow*. Therefore, ADA Viteretti is absolutely immune from all claims in East Coast's § 1983 action that arise from his decision to initiate the destruction hearing.

## B. Qualified Immunity

■ Prosecutors and law enforcement officers are shielded by a qualified immunity from suit and liability for civil damages pursuant to § 1983 for investigative acts. *See Robison,* 821 F.2d at 920; *Barrett v. United States,* 798 F.2d 565, 573 (2d Cir. 1986).

■ The Supreme Court has explicitly stated its unwillingness "to complicate qualified immunity by making the scope or extent of immunity turn on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated." *Anderson v. Creighton,* 483 U.S. 635, 643, 107 S.Ct. 3034, 3041, 97 L.Ed.2d 523 (1987). Rather, there are three straightforward grounds on which an official can preserve or establish qualified immunity for his official conduct:

> A defendant may establish a right to qualified immunity by showing that it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution; or that it was not clear at the time of the acts at issue that an exception did not permit those acts; or that it was *objectively reasonable* for the officer to believe that his acts did not violate plaintiff's rights.

*Krause v. Bennett,* 887 F.2d 362, 368 (2d Cir.1989) (citations and internal quotations omitted). As was the case in *Krause,* because the alleged constitutional and statutory violations of which East Coast complains involve rights that were clearly established at the time of the execution of the warrant, and to which no exceptions have been shown to be applicable, only the third of these grounds is available to the

---

111 S.Ct. at 1949–50, 114 L.Ed.2d at 571 (second emphasis added).

**6.** The Defendants argue that *Burns* is distinguishable from this case insofar as the prosecutor's actions there bordered on bad faith whereas ADA Viteretti's actions "were in good-faith and motivated by his interest in protecting the public health from the potential danger which these fireworks created." Defs.' Reply Mem. 4.

However, this line of reasoning is without merit because it does not contribute to the determination of whether ADA Viteretti has absolute or qualified immunity in this function. Rather, this argument goes only to the issue of whether ADA Viteretti can invoke a qualified immunity defense. The relevant ground upon which *Burns* is to be distinguished is set forth below.

Defendants.[7] *See id.* The focus is on whether a reasonable officer could have believed his actions to have been lawful in light of clearly established law and the information available to him at the time he acted. *See Maduro,* 907 F.2d at 1291; *East Coast,* 781 F.Supp. at 1011.

The determination of whether a public official is entitled to qualified immunity on this third ground "generally turns on the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Maduro,* 907 F.2d at 1291 (quoting *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038–39). *Accord East Coast,* 781 F.Supp. at 1011. An official is entitled to qualified immunity from suit and liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2728. *Accord Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir.1990). But,

> [e]ven where the law is "clearly established" and the scope of an official's permissible conduct is "clearly defined," the qualified immunity defense also protects an official if it was "objectively reasonable" for him at the time of the challenged action to believe his acts were lawful.

*Id.* (citations omitted).

The Court in *Maduro* defined the standard by which the Defendants' claim for qualified immunity on the ground of objective reasonableness must be judged: "[I]n the context of a motion for summary judgment, the relevant inquiry is whether the federal defendants are immune from suit *if* the facts are as asserted by the [*plaintiff*]." 907 F.2d at 1293. In *Maduro,* the

plaintiffs, members of a so-called "social club," brought a § 1983 action against various state and federal officials and agencies on the ground that their constitutional rights were violated as a result of the warrantless entry and search of the club. *See id.* at 1290. The defendant FBI agents argued that they were entitled to qualified immunity because they reasonably believed that the club was open to the public and could be entered without a warrant. *See id.* at 1291. The plaintiffs responded that the club was not open to the public but only to members and their guests. *See id.*

On that record, the Second Circuit defined the relevant inquiry for determining the issue of qualified immunity as follows:

> whether, in light of clearly established law and the information possessed by the defendants, it was objectively reasonable for the [FBI agents] to believe that their warrantless entry into the [club] was lawful; the [FBI agents'] subjective beliefs concerning the legality of the search are irrelevant.

*Id.* at 1292. The Second Circuit concluded that the agents were entitled to qualified immunity because their conduct of entering the club without a warrant was objectively reasonable in light of their knowledge of the general lack of membership requirements of clubs such as this one, and because it was reasonably for them to rely on the instructions of their superior in the chain of command, which instructions were consistent with the agents' personal knowledge and experience. *See id.*

In the matter at hand, the relevant inquiry is whether, in light of clearly established law, to wit, the Fourth Amendment and New York Penal Law § 270.00 (McKinney

7. The Defendants concede that East Coast "had a clearly protected right under the Constitution" but assert that they are entitled to qualified immunity on the other two grounds. Defs.' Reply Mem. 6. Specifically, they argue that ADA Viteretti and Karen Pakstis should be entitled to qualified immunity under both of [these] standards, since based on the facts that were relayed to them and the fact that a neutral judge had signed a search warrant it was: (1) *at most,* not clear at the time of their advice that an exception to the Fourth Amendment did not permit the seizure; or (2) objectively reasonable for them to believe that their advice did not violate [East Coast's] rights. *Id.* However, with regard to standard (1), the Defendants do not offer any further analysis to support this assertion and establish the nature or extent of the Fourth Amendment exception they may have thought existed at the time of the seizure. In the absence of such analysis, their claim of qualified immunity on this ground necessarily fails and only the standard of objective reasonableness remains as a possible ground for their claim.

1989) ("§ 270.00"), and the information possessed by the Defendants on April 25, 1989, it was objectively reasonable for the Defendants to believe that the seizure of East Coast's entire inventory was lawful under the warrant. Section 270.00 defines unlawfully dealing with fireworks and categorizes a variety of offenses. *See* N.Y. Penal Law § 270.00(1) and (2). Section 270.00(3) sets forth a series of exceptions to the proscriptions of the statute, including the following: "nor shall anything in this act contained be construed to prohibit the manufacture of fireworks, nor the sale of any kind of fireworks, provided the same are to be shipped directly out of the state." Therefore, to the extent that East Coast's operation was that of importing, storing, and then selling fireworks for resale or use outside of the State of New York, it was engaged in a legal business enterprise, and its fireworks inventory was lawfully held property.

The sequence of events and information available to the Defendants during the operation against East Coast, as testified to by the Defendants and as alleged by East Coast, are the following:

Det. Kolpan went to Ben Cinquegrana, Louis Cinquegrana's father, and told him he head a list of prices for fireworks. He asked the senior Mr. Cinquegrana if he knew anyone who could give him a better price. Because Louis worked for [East Coast], and [East Coast] was in the fireworks business, Mr. Cinquegrana told Kolpan that his son could probably get him a better price. Mr. Cinquegrana neither offered to sell Kolpan fireworks, nor agreed, on behalf of Louis, or [East Coast], to sell fireworks. Rather, he put Kolpan in touch with Louis. There was a telephone conversation between Louis and Det. Kolpan in which Louis merely stated that he could do better with the price. The two agreed to meet, in New Jersey, where Louis looked at Kolpan's list and told him he could get him the same fireworks for a better price than that on the list. Although Louis denies it, Kolpan claims that he, at that point, told Louis that he wanted to transport the goods within New York State. He claims that Louis then told him he could not lawfully sell goods for use in New York [S]tate and that he would need an out-of-state license. At this point, the two entered into an agreement for the sale of fireworks. There is no evidence that prior to this conversation, when an agreement was reached to sell the fireworks, that Kolpan told Louis or Ben Cinquegrana that he planned to sell the fireworks in New York State.

Thereafter, Kolpan went to [East Coast's] warehouses to pick up the merchandise. On that day, a search warrant was issued by the New York Criminal Court, on the basis of the affidavit of Police Officer Edward Dawson[, which affidavit was based on a conversation between Lieutenant Walsh in which Lieutenant Walsh related a conversation he had with Detective Kolpan,] allowing the police to search and seize "fireworks, which property is evidence of the crime Unlawfully Dealing with Fireworks." Nowhere in the affidavit does it state that the agreement to buy the fireworks occurred in New Jersey and not in New York. There is no mention at all of when various statements were made or where. The agreement between Kolpan and Louis for the sale of under $10,000.00 worth of fireworks. And, although Kolpan says he repeatedly told Louis directly that he was taking the fireworks to New York City, no recording of that conversation was produced despite the fact that Kolpan told Louis, at the scene, that he had it "all on tape." Moreover, simultaneously with the exchange of the money, *Kolpan signed a receipt with a representation ["release"], stating that he was not buying the fireworks for sale in New York State.* When questioned about the release, he first stated that Louis wanted the release to "cover his ass," and later stated that Louis told him to sign the release to show that he was taking the fireworks to New Jersey.

At the premises, Kolpan had a list of items he wanted. · The items were located at all three bunkers.... [A]t the trial, Kolpan testified that the items from

the list were in three different bunkers and that Louis offered him other items, not on the list, to replace those he did not have.

\*　\*　\*　\*　\*　\*

In a planned maneuver, approximately 50–60 police officers were waiting in the woods around [East Coast] for [Kolpan's] signal ... that the deal was completed. They entered the premises, and began a search of all three bunkers although, at this point, the search warrant had not arrived. Kolpan left immediately after his part of the deal was completed having only, by his signal, indicated to the other officers that he had made the deal and that the money had passed hands.

Pl.'s Br. in Opp'n to the Defs.' 1st Mot. for Summ. J.[8] 6–9 (citations omitted).

The individual Defendants offer a classic circular argument to establish the qualified immunity of each, arguing that, in reference to the seizure: (1) ADA Viteretti is absolutely immune because he is a prosecutor or, in the alternative, is entitled to qualified immunity because he relied on Detective Kolpan and Inspector Biehler in good faith; (2) Officer Pakstis is entitled to qualified immunity because she relied on Detective Kolpan and Inspector Biehler; (3) Inspector Biehler and Lieutenant Walsh are entitled to qualified immunity because they relied on ADA Viteretti and Officer Pakstis in good faith; and (4) Detective Kolpan is not a proper party because he had no involvement in the seizure. The Defendants also attack the § 1983 claim on a number of other grounds, each of which will be addressed below. The question, then, is whether it was objectively reasonable for the individual Defendants to act in their various official capacities as they did by relying on each other during the seizure of East Coast's entire inventory.

### 1. ADA Viteretti and Officer Pakstis

■■ ADA Viteretti and Officer Pakstis were part of the onsite operation team and advised the Department on the execution of the search warrant and the seizure of the inventory. The Defendants contend that

ADA Viteretti and officer Pakstis have qualified immunity because they relied on Detective Kolpan's representations, as conveyed to them by Inspector Biehler, regarding the sale of the fireworks:

> With respect to the execution of the search warrant on [East Coast's] premises, it is undisputed that Insp. Biehler, after being informed of the circumstances surrounding Det. Kolpan's purchase of fireworks from Louis, informed both ADA Viteretti and Karen Pakstis that Louis had made [East Coast's] entire inventory available for sale to Det. Kolpan knowing that Det. Kolpan intended to sell the fireworks in New York City.

Defs.' Mem. 10–11.

While East Coast disputes the claim that such a conversation took place between Inspector Biehler and Detective Kolpan, the allegations are silent with respect to the alleged conversations between Inspector Biehler and ADA Viteretti and Officer Pakstis. Thus, regardless of whether the Biehler/Kolpan conversation took place, ADA Viteretti and Officer Pakstis may assert a defense of qualified immunity based on their undisputed good faith reliance on Inspector Biehler's report of his alleged conversation with Detective Kolpan. Based on Biehler's communication to ADA Viteretti and Officer Pakstis that East Coast's entire inventory was made available to Detective Kolpan for purchase and resale in New York City, it was objectively reasonable for the attorneys to believe that their advice to the police, namely, the police could confiscate East Coast's entire inventory under color of the search warrant, did not violate East Coast's constitutional rights. *See Krause*, 887 F.2d at 368.

ADA Viteretti and Officer Pakstis are shielded by qualified immunity pursuant to *Krause*'s "objectively reasonable" basis for such immunity. Thus, their Rule 12(b) motions are granted, dismissing all of East Coast's claims against them.

---

**8.** Incorporated by reference in Plaintiff's Reply Memorandum of Law.

### 2. Inspector Biehler and Lieutenant Walsh

In East Coast's Amended Complaint, it alleges that Inspector Biehler "was the ranking official in charge of Manhattan South's Public Morals Division of the Police Department, and was ... and empowered by, ... the City with policy making decisions regarding the operations of said Public Morals Division." Am.Compl. ¶ 4. It alleges further that Inspector Biehler "was the commanding officer in charge of the raid upon plaintiff's property...." *Id.* at ¶ 22A. With respect to Lieutenant Walsh, East Coast alleges that he "participated, in a supervisory capacity, in the investigation leading to the search, seizure and destruction of plaintiff's property and participated fully in the raid, seizure and destruction of plaintiff's property." *Id.* at ¶ 22E.

#### a. *Lieutenant Walsh Has Qualified Immunity*

■ The present record supports the conclusion that Lieutenant Walsh is shielded by qualified immunity from liability for his actions against East Coast. It was objectively reasonable for Lieutenant Walsh to believe that his actions, taken in reliance on the information and instructions he received from Inspector Biehler, who was in command of the operation, and from ADA Viteretti and Officer Pakstis, did not violate East Coast's constitutional rights. Therefore, Lieutenant Walsh's Rule 12(b) motion to dismiss the claims against him is granted.

#### b. *Inspector Biehler's Assertion of Qualified Immunity is Not Supported by This Record*

■ Inspector Biehler asserts two defenses of immunity against East Coast's claims: the first is immunity from liability based on their reliance on the legally valid warrant, while the second is a claim of qualified immunity based on their allegedly good faith reliance on the representations of Detective Kolpan and on the advice of counsel in executing that warrant. Inspector Biehler contends that these are unique and independent defenses because the latter is strictly a determination of law which the Court appropriately may decide on his motions.

The difficulty with this bifurcated view of these defenses is that, while it is an issue of law, the question of whether Inspector Biehler is entitled to assert a defense of qualified immunity requires a preliminary determination of the objective reasonableness of his beliefs about his actions. *See Dwyer,* 906 F.2d at 74; *Krause,* 887 F.2d at 365, 368. However, such a determination is one of fact and is inappropriate on a motion for summary judgment in the face of a factual dispute or the need for further discovery. *See Dwyer,* 906 F.2d at 74; *White v. Frank,* 855 F.2d 956, 958, 962 (2d Cir.1988). In such cases, "[i]f there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues on special interrogatories." *Dwyer,* 906 F.2d at 76. This instruction is appropriate for the determination of the factual issues at hand, and the Court declines to usurp the function of the jury in disposing of them on Inspector Biehler's motions.

The question of whether it was "objectively reasonable" for Inspector Biehler to believe his actions did not violate East Coast's rights is not established on the present record. The genuine issue preventing Inspector Biehler from asserting qualified immunity as a defense at this time turns on the alleged conversation he had with Detective Kolpan after the latter purchased the fireworks from Louis. If Detective Kolpan did not tell Inspector Biehler that Louis had made East Coast's entire inventory available to him for purchase, or that Louis knew Detective Kolpan intended to resell the fireworks in New York City, it was not objectively reasonable for Inspector Biehler to believe the subsequent actions he took in confiscating the inventory did not violate East Coast's rights.[9]

---

**9.** In addition to denying the alleged Biehler-Kolpan conversation, East Coast has placed in evidence the aforementioned receipt, which has been characterized as a release, purporting to show Detective Kolpan signed the document and explicitly acknowledged to Louis that the

■ Finally, a claim of qualified immunity cannot be based on an official's reliance on the advice of counsel which merely serves as a filter through which that official's own bad faith misrepresentations are passed in an effort to certify them as the foundation for apparently objectively reasonable beliefs upon which he subsequently acts. The present record does not allow Inspector Biehler to rely on his discussions with counsel as the basis for his defense of qualified immunity because the advice he received from them and upon which his claim for qualified immunity is asserted was based in critical part on the representations *he made to them* about the content of his alleged conversation with Detective Kolpan. According to East Coast's allegations, any advice Inspector Biehler solicited and received from ADA Viteretti and Officer Pakstis was the product of his own misrepresentations made in bad faith to them about his alleged conversation with Detective Kolpan, and Inspector Biehler cannot immunize himself from liability for his actions based on the advice of counsel if he solicited that advice as a sham to avoid liability.

The Defendants contend that:

[t]o defeat Insp. Biehler's and Lt. Walsh's defense of qualified immunity, the record must show it to be obvious that no reasonably competent officer, after consulting with two attorneys, would have concluded that [East Coast's] entire inventory should be seized.

Defs.' Mem. 14 (citing *Thomas v. Culberg,* 741 F.Supp. 77, 81 (S.D.N.Y.1990)). This is precisely what this record on the present motions shows. In the face of East Coast's presumptively true factual allegations regarding the genuine issues identified above, it follows that, at this stage in the proceedings, a determination cannot be made about whether Inspector Biehler's beliefs were objective reasonable at the time he oversaw the confiscation of East Coast's inventory. Therefore, Inspector Biehler's Rule 12(b) and Rule 56 motions are denied.

fireworks were not going to be used in New York State. If this allegation is true, as the Court for the time being must assume it to be,

### 3. Detective Kolpan

■ It is undisputed that after he signalled the awaiting police officers of his purchase of fireworks from Louis, Detective Kolpan left East Coast's premises. The Defendants contend that Detective Kolpan played no role in the decision-making process regarding the seizure of the fireworks or the destruction of the inventory. Therefore, in their view, Detective Kolpan is not a proper party to this action because East Coast's claim is for the unlawful seizure of its property.

However, it is Detective Kolpan's alleged conversation with Inspector Biehler that underlies the entire decision-making process, which resulted in the confiscation and destruction of East Coast's inventory. All of the advice given by ADA Viteretti and Officer Pakstis and all of the decisions made by Inspector Biehler and Lieutenant Walsh is claimed by the Defendants to fall under *Krause's* "objectively reasonable" standard, 887 F.2d at 368, because Detective Kolpan's allegedly told Inspector Biehler, first, that Louis had offered the entire inventory to Detective Kolpan, and second, that Louis knew Detective Kolpan intended to resell the fireworks in New York City.

As is the case with Inspector Biehler, Detective Kolpan would not be able to assert a defense of qualified immunity for his role in the confiscation and destruction of East Coast's property if he had intentionally misled Inspector Biehler about his conversations and transaction with Louis. At this stage in the proceedings, then, the question of Detective Kolpan's claim of qualified immunity cannot be resolved definitively in his favor, and his Rule 12(b) motion to dismiss on this basis is denied.

### IV. The District Attorney is Not a Proper Party

#### 1. Liability for Failure to Train

It is well-settled that an individual may not be held liable for civil rights violations committed by his subordinates unless that

the sale of the fireworks to Kolpan was legal and in full compliance with the requirements of § 270.00.

individual was personally involved in the unlawful act, *see Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir.1987); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir.1987), and the Second Circuit has held that personal involvement in the "constitutional deprivations is a prerequisite to an award of damages under § 1983," *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986).

■ However, a municipality's policymaker may be held individually liable for constitutional deprivations resulting from his failure to train or supervise his subordinates when this failure constitutes nothing less than "deliberate indifference to the constitutional rights of citizens." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir.1992). To sustain such a claim and trigger individual liability of a policymaker, three requirements must be met. The plaintiff must show:

■ that a policymaker knows "to a moral certainty" that her employees will confront a given situation[;] ... [2] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation[; and] ... [3] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Id.* at 297–98.

## 2. The Allegations

East Coast alleges that:

the defendant Robert Morgenthau ... was the duly elected District Attorney of the County of New York of the City and State of New York, and as such, is and was charged with the duty and responsibility for overseeing and controlling the activities of his office personnel, including Vitteretti [sic] and was responsible for policy making decisions regarding the activities of the District Attorneys Department and its personnel in connection with ... decisions regarding the obtaining [of] search warrants and the execution thereof by defendants Police Depart-

ment, the City, Vitteretti [sic], Biehler and others.

Am.Compl. ¶ 5. East Coast also contends that the District Attorney

had a duty to properly train and supervise his assistants in knowing and applying the laws of this State. The seizure of plaintiff's inventory was not a minor action on the part of the police, but rather was a major action which included fifty to seventy-five police personnel on the premises [in] Newburgh, as well as the presence of at least two attorneys on plaintiff's upstate property.

Pl.'s Mem. 6.

■ The Defendants contend that the claim against the District Attorney must be dismissed because East Coast has failed to allege that he was personally involved in the acts that are now claimed to have violated East Coast's constitutional rights. In the face of that failure, the Defendants claim that the District Attorney only may be held liable in his role as policymaker, and East Coast

has failed to allege or demonstrate that D.A. Morgenthau created any custom, policy or practice concerning the obtaining or execution of search warrants by A.D.A. Viteretti or NYPD which resulted in unconstitutional practices occurring, or that he permitted such a custom, policy or practice to continue.

Defs.' Mem. 18.

The Defendants' have misstated the allegation against the District Attorney by focusing on the lack of his personal involvement and the validity of the search warrant. The key issue is whether there should have been a policy or practice in the District Attorney's Office regarding the enforcement § 270.00. However, even when all of the allegations in the Amended Complaint are assumed to be true and all factual inferences are drawn in East Coast's favor, it must be concluded that East Coast has failed to satisfy the requirements of the three-pronged *Walker* test. Therefore, East Coast's claims against the District Attorney are dismissed.

The deficiency of East Coast's allegations is demonstrated in the systematic ap-

plication of the three prongs of the *Walker* test. First, while the problem of illegal fireworks in New York City recurs with the predictable frequency of the Fourth of July, the Chinese New Year, and other holiday celebrations, East Coast's claim does not rise to the level of alleging that the District Attorney knew "to a moral certainty" that his employees would confront the unique situation which arose in Newburgh on April 25, 1989. As the Second Circuit noted, "a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events," as was the case here. *See Walker,* 974 F.2d at 297.

Second, East Coast's allegations fail to allege either that the situation at Newburgh constituted the kind of "difficult choice" requiring a specific policy requiring training in the elements of § 270.00, or that there was a history of employees in the District Attorney's office mishandling similar situations. Certainly, the allegations here fall far short of those in *Walker,* in which the Second Circuit held the district attorney liable for the lack of training and supervision regarding the assistant district attorneys' obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to avoid the use of perjured evidence.

Finally, while it is indisputable that wrong choices about the enforcement of § 270.00 by the District Attorney's office may cause the deprivation of a citizen's constitutional rights, East Coast's allegations fail to demonstrate that the enforcement of § 270.00 is of such significance that the District Attorney must "concentrate training and supervision resources on [this] situation[ ] ... [because] employee misconduct is likely to deprive citizens of constitutional rights." Again, East Coast's allegations fail to assert that wrong choices about the enforcement of § 270.00 are on a par with an ADA's failure to comply with the obligations imposed by *Brady.* From East Coast's allegations and the record before the Court, it is not possible to distinguish § 270.00 from any other section of the New York Penal Law about which a wrong enforcement decision could result in

the deprivation of a citizen's constitutional rights. Therefore, as was the case with the first two prongs, East Coast has failed to satisfy the third prong of the *Walker* test.

Finally, for the reasons stated above in finding that ADA Viteretti has qualified immunity for the advice he gave to Inspector Biehler and the Department on East Coast's premises, it is reasonable to conclude that ADA Viteretti was properly trained in the law of § 270.00 by the District Attorney's office.

In the face of East Coast's failure to establish the District Attorney's liability for its § 1983 claims, the District Attorney's motion to dismiss all claims against him is granted.

## V. The City is Liable for the Failure to Train the Police

East Coast alleges that "the gross and inadequate training given to police officers involved in fireworks interdiction concerning the legality of selling fireworks in the state of New York" gives rise to municipal liability. Am.Compl. ¶ 23E. According to East Coast, the City should have trained its employees to know that there is nothing unlawful about storing or selling fireworks in the State of New York. As is suggested by the deposition testimony of Inspector Biehler and Lieutenant Walsh, cited by East Coast, those in charge of Operation Skyrocket were unfamiliar with the provisions of § 270.00 regarding the conditions under which a business may lawfully store and sell fireworks in the State of New York. Thus, it is alleged that the raid and seizure were planned at the highest level of the Department, that the operation involved approximately 50 to 75 officers from various precincts, and that the person leading the operation, Inspector Biehler, was responsible for fireworks interdiction in his precinct but was unaware of various critical provisions of § 270.00.

The Defendants respond that the training in question was not such that it amounted to "deliberate indifference to the rights of person with whom the police come

into contact," *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989), and that "[t]he sole basis for possible municipal liability which this Court found in [the Opinion] was Chief Johnston's directive concerning fireworks interdiction." Defs.' Mem. 21.

The Defendants' characterization of the scope of the basis for a claim of municipal liability is incorrect. In the Opinion, the Court noted that:

> [i]t appears from the events at issue that the [Police] Commissioner delegated the policymaking authority to Chief Johnston. Chief Johnston authored the memorandum that set off the events in question. Inspector Biehler carried out that directive and orchestrated the seizure of the inventory.

*East Coast,* 781 F.Supp. at 1010–11. From this it was concluded that:

> [t]his by no means appears to be a random, unauthorized act by a single police officer. Rather, it appears to have been a large-scale operation, involving numerous high-level officers, operating pursuant to Chief Johnston's directive.

*Id.* at 1011. While these considerations highlight Chief Johnston's role in defining the policy pursuant to which Operation Skyrocket was executed, they do not necessarily preclude the acts of other "high-level officers" in their capacity of training and supervising those involved in Operation Skyrocket from contributing to a claim for municipal liability.

In light of these considerations on the Defendant's first motion for summary judgment, this Court held there is "a question of fact concerning whether the Police Department's actions should give rise to municipal liability, and the City's motion for summary judgment on this ground is

denied," *East Coast,* 781 F.Supp. at 1011. This holding is equally applicable to the present record.

The additional allegations of municipal liability based on the contention that the Department failed to train and supervise those participating in Operation Skyrocket, and supported by the various factual assertions made regarding Inspector Biehler and Lieutenant Walsh's knowledge and actions, are sufficient to withstand the Defendants' Rule 12(b) and Rule 56 motions. Therefore, those motions are denied.

## VI. The Third Cause of Action is Precluded by the Destruction Hearing

In the Opinion, this Court found that East Coast was in privity with Louis for the purposes of the destruction hearing. *See East Coast,* 781 F.Supp. at 1006–8. East Coast is, then, collaterally estopped from raising any issues against the Defendants that relate to the destruction of its property as a result of the court order that followed the hearing, and that hearing has res judicata effect for any present claims for damages as a result of that hearing.

Specifically, East Coast's Third Cause of Action alleging that "[d]efendants' acts in disposing of plaintiff's inventory were deliberately reckless, negligent and in violation of plaintiff's legal rights and remedies," Am.Compl. ¶ 40, is dismissed as a claim precluded by the destruction hearing under the principle of res judicata, while those parts of East Coast's First and Second Causes of Action which regard the destruction of East Coast's inventory, Am. Compl. ¶¶ 21, 27, 36, are dismissed as precluded issues under the principle of collateral estoppel.[10]

---

10. However, as was expressly noted in the Opinion East Coast's § 1983 claim continues to survive even in the face of the destruction hearing:

> The present action is based partially upon allegations that the search warrant was executed unlawfully. At the destruction hearing, the judge stated explicitly that "(t)he issue is not before this court as to whether the fireworks were lawfully seized." This issue was not necessarily decided in the destruction

> hearing, and East Coast's claim is not barred on this basis.

*East Coast,* 781 F.Supp. at 1006 (citation omitted). Thus, in dismissing the various claims identified here, the Court reiterates the fact that East Coast's § 1983 claim for damages arising from the allegedly unlawful execution of the search warrant is not precluded by decision of the court at the destruction hearing.

**302**

VII. East Coast Has Not Stated a Claim for Trespass

 Federal courts and the courts of the State of New York have consistently held that an officer who enters premises pursuant to a valid search warrant cannot be held liable for trespass. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 489 n. 3, 106 S.Ct. 1292, 1303 n. 3, 89 L.Ed.2d 452 (1986); *Calamia v. City of New York*, 879 F.2d 1025, 1031 (2d Cir.1989); *Anderson v. WHEC–TV*, 92 A.D.2d 747, 748, 461 N.Y.S.2d 607, 608–09 (4th Dep't 1983); *Iovinella v. Sheriff of Schenectady County*, 67 A.D.2d 1037, 1038, 413 N.Y.S.2d 497, 499 (3rd Dep't 1979), *appeal denied*, 47 N.Y.2d 707, 418 N.Y.S.2d 1025, 391 N.E.2d 1366 (1979).

 As its Fifth Cause of Action in the Amended Complaint, East Coast alleges that the Defendants, without the consent of East Coast, entered upon its premises and removed its fireworks inventory, that is, the Defendants trespassed on East Coast's property. However, in alleging this cause of action, East Coast has failed to state a claim against any of the Defendants. Detective Kolpan entered East Coast's premises with the consent and authorization of Louis. Thus, the claim of trespass against him necessarily fails and is dismissed.

With respect to Inspector Biehler, Lieutenant Walsh, Officer Pakstis, ADA Viteretti, and the other Department personnel who entered East Coast's Newburgh premises on April 25, 1989, they lawfully entered the premises pursuant to a search warrant that this Court has previously held to have been facially valid. *See East Coast*, 781 F.Supp. at 1009. Therefore, East Coast has failed to state a claim for trespass against these Defendants, and its Fifth Cause of Action is dismissed.[11]

*Conclusion*

For the reasons set forth above, East Coast's Third and Fifth Causes of Action are dismissed, as are those parts of East Coast's First and Second Causes of Action,

namely ¶¶ 21, 27, and 36 of the Amended Complaint, which concern the destruction of East Coast's inventory as a result of the destruction hearing. The Rule 12(b) motions of ADA Viteretti, Officer Pakstis, Lieutenant Walsh, and the District Attorney are granted; the Rule 12(b) motions of Inspector Biehler, Detective Kolpan, and the City of New York are denied; and the Defendants' Rule 56 motions for summary judgment are also denied. .

It is so ordered.

---

**11.** This applies to the claim against the District Attorney as well. It is undisputed that he did not enter upon East Coast premises on April 25,

1989, and thus, East Coast cannot maintain its trespass claim against him.