**In re AJ CONTRACTING COMPANY, INC., Debtor.**

**AJ Contracting Company, Inc., and The Official Committee of Unsecured Creditors of AJ Contracting Company, Inc., Plaintiffs,**

**v.**

**The City of New York and The County of New York District Attorney Robert M. Morgenthau, Defendants.**

**Bankruptcy No. 00 B 14842(REG). Adversary No. 02/2539A.**

United States Bankruptcy Court, S.D. New York.

Oct. 14, 2003.

Todtman, Nachamie, Spizz & Johns, P.C., by Scott S. Markowitz, Jill L. Makower, New York City, for Plaintiff Official Committee of Unsecured Creditors.

Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP, by Clifford A. Katz, New York City, for Plaintiff AJ Contracting Company, Inc., Debtor and Debtor–in–Possession.

Robert M. Morgenthau, District Attorney, New York County, by Michael S. Morgan, New York City, as Special Assistant Corporation Counsel.

City of New York Law Department, Office of Corporation Counsel, by M. Diane Jasinski, New York City, for Defendant City of New York.

## DECISION AND ORDER ON MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of a case under chapter 11 of the Bankruptcy Code, the Creditors' Committee of the debtor AJ Contracting Company, Inc., on behalf of the AJ Contracting Estate, seeks to recover, as a fraudulent conveyance and misappropriation of statutory trust funds, more than $3 million that was paid by AJ Contracting to the defendant Robert M. Morgenthau, the District Attorney for New York County of the State of New York, under a plea bargain after the indictment of AJ Contracting and its principal, Charles Uribe, for commercial bribery. DA Morgenthau has moved to dismiss the action for lack of subject matter jurisdiction.[1]

DA Morgenthau seeks to invoke sovereign immunity and the protection of the Eleventh Amendment[2] with respect to such claims, which if applicable would deprive this Court of subject matter jurisdiction to hear them. The Creditors' Committee and DA Morgenthau agreed to present a threshold issue to this Court— whether in acting as he did to take the Debtor's funds, DA Morgenthau was acting on behalf of the State (in which case the Eleventh Amendment would be applicable), or New York County (in which case it would not be).[3]

For the reasons that follow, the Court concludes that in accepting the plea bargain and structuring it in the manner he did, DA Morgenthau was acting in a classic prosecutorial capacity, on behalf of the People of the State of New York, and that any Creditors' Committee's claims with respect to actions of this character would be barred by the Eleventh Amendment. But the Court further concludes that with respect to actions *after* the plea bargain was structured—as to which DA Morgenthau was acting essentially as a creditor and in a manner that did not involve his judgment as a prosecutor (or even as a lawyer)—he is not entitled to Eleventh Amendment immunity. The Creditors' Committee's claims in the latter respect (which are not

---

1. *See* Fed.R.Civ.P. 12(b)(1), applicable in adversary proceedings, like this one, under Fed. R. Bankr.P. 7012(b).

2. U.S. Const. amend. XI.

3. For that reason, the Court is not called upon now to decide whether (as DA Morgenthau also argues) section 106(a) of the Bankruptcy Code, under which Congress has abrogated sovereign immunity with respect to claims of the type here, is unconstitutional. After the argument on this motion, the Supreme Court granted certiorari with respect to that issue in another case. *See Hood v. Tennessee Student Assistance Corp.,* 319 F.3d 755 (6th Cir.), *cert. granted,* 71 U.S.L.W. 3724, 2003 WL 21134036 (Sept. 30, 2003).

its strongest claims)[4] can survive Eleventh Amendment challenge. With the Creditors' Committee having disclaimed the intention to assert claims of the first type, and to rely solely on claims of the second type, DA Morgenthau's motion to dismiss is denied.

### Facts

The facts relevant to the motion are not in dispute. In June 1998, the Debtor and its principal, Charles Uribe, were charged with serious allegations of commercial bribery,[5] and pursuant to a plea agreement dated June 17, 1998, they both pled guilty. Under the plea agreement, Uribe avoided jail time, and received probation instead,[6] but as part of the deal, each of Uribe and AJ Contracting undertook financial obligations, with the Debtor AJ Contracting taking the brunt of them. AJ Contracting agreed to pay to the New York County District Attorney's Office $3,333,333 "in lieu of fine, forfeiture, cost of investigation and prosecution";[7] Uribe guarantied AJ Contracting's payment obligation.[8]

The fine was not to be paid as an immediate lump sum. Rather, the plea agreement required the Debtor to pay $1 million on the date the plea became effective, and to pay the balance in equal installments on each of the four successive anniversaries of the plea.[9] But notwithstanding the four additional years allowed for AJ Contracting to pay the fine, Uribe caused AJ Contracting to pay $3,035,333 (the "Funds") within just a few months after execution of the Plea Agreement, on October 27, 1998.

The Creditors' Committee alleges (and for the purposes of this motion the Court accepts as true) that Uribe—during the time before which he would have to leave AJ Contracting and during which he could still exercise control over it[10]—ordered 13 dramatically accelerated payments to the District Attorney's Office "to reduce his exposure on the guaranty," knowing that he was in "poor health" and that AJ Contracting "did not have the financial wherewithal to make the [p]ayments without misappropriating" money that AJ Contracting, as a general contractor, held "in a statutory trust for the benefit of subcontractors retained by AJ [Contracting] on

4. Along with various other arguments that were deferred to await decision on the threshold issue, DA Morgenthau argued, with some force, that payments DA Morgenthau received after the plea agreement was structured were in satisfaction of an antecedent debt, and thus for fair consideration. (DA Morgenthau Opening Br. at 9 n. 8). If so, that would make such payments preferential (though outside the time period under which they are recoverable) but not recoverable as fraudulent conveyances. The desire of the parties, particularly DA Morgenthau, that the subject matter jurisdiction issue be considered first, even though other issues might make the Eleventh Amendment determination academic, required the Court to decide the issues in the order in which it is doing so.

5. Commercial Bribing in the First Degree, a Class E felony, in violation of New York Penal Law § 180.03.

6. See Plea Agreement, Exh. D. to DA Morgenthau's Motion, ¶¶ 10(a), 10(c).

7. *Id.* at ¶ 11. This was not, strictly speaking, a fine, but it was the economic equivalent of one, and the Court here will refer to it as such.

8. He also was required to resign any position and title with AJ Contracting and to sever any further association with the company within one year of the plea. (Plea Agreement ¶ 14). The plea agreement further required Uribe to cooperate with prosecutors, and, significantly for the administration of justice but not for this motion, included prophylactic measures with respect to AJ Contracting's future operations structured to prevent like conduct in the future. (*Id.* ¶ 13).

9. Plea Agreement ¶ 11.

10. Cmplt. ¶ 32.

numerous construction jobs." [11] The Creditors' Committee further alleges that AJ Contracting's payment of those funds rendered it insolvent (if it was not already in that condition), leaving AJ Contracting with "an unreasonably small amount of capital to operate its business," and that AJ Contracting incurred debts beyond its "ability to pay such debts as they matured." [12] And the Creditors' Committee alleges that "[a]t least $2,000,000 of the monies utilized by AJ [Contracting]" to meet its obligations under the plea agreement were funds held in trust for its subcontractors. [13]

Uribe died before his sentence was formally imposed, and the criminal proceeding against him was abated by death. By no later than October 2000, AJ Contracting did indeed lack the funds to pay its debts to its creditors, and to account to subcontractors for whom it was deemed, under law, to hold funds in trust; on October 17, 2000, AJ Contracting filed a chapter 11 petition in this Court. [14]

On behalf of the Debtor, and with the Debtor joining as a co-plaintiff, the Creditors Committee brought this action under Bankruptcy Code sections 510, 544(b) and 550, which in turn support relief under applicable state law (New York's fraudulent conveyance statute [15] and its Lien Law [16]) to recover the Funds. In particular, the Creditors' Committee alleges that:

(1) AJ Contracting's payments to DA Morgenthau constituted a constructive fraudulent conveyance—recoverable under N.Y. Debtor & Creditor Law §§ 270–275; [17]

(2) AJ Contracting's payments to DA Morgenthau were made with the actual intent to defraud AJ Contracting's creditors—recoverable under N.Y. Debtor & Creditor Law § 276; [18] and that

(3) at least $2 million of those payments were made with funds that AJ Contracting held in trust for its subcontractors—recoverable under New York Lien Law § 77. [19]

The Creditors Committee also seeks judgment, under the Bankruptcy Code's equitable subordination provision, [20] subordinating DA Morgenthau's claim under the Plea Agreement to those of AJ Contracting's unsecured creditors. [21]

The Creditors' Committee makes clear that its claims against DA Morgenthau are in his official, as contrasted to personal, capacity. [22]

11. Cmplt. ¶¶ 28–30, 33.

12. Cmplt. ¶¶ 22–25.

13. Cmplt. ¶ 28.

14. In November 2000, one month after AJ Contracting's chapter 11 case was filed, sentence was formally imposed on AJ Contracting in accordance with the terms of the Plea Agreement. By this time, all but $300,000 of the AJ Contracting/Uribe fine obligation—originally in the amount of $3.3 million—had long since been paid. DA Morgenthau Opening Br. at 3–4.

DA Morgenthau has not filed a proof of claim in connection with the remaining $300,000. Thus the Court has no occasion to consider the Eleventh Amendment implications that might have resulted from his having filed a proof of claim.

15. NY Debtor and Creditor Law §§ 270–276.

16. New York Lien Law §§ 70–78.

17. Cmplt. ¶¶ 19–26.

18. Cmplt. ¶¶ 27–36.

19. Cmplt. ¶¶ 37–49.

20. 11 U.S.C. § 510.

21. Cmplt. ¶¶ 50–55.

22. Cmplt. ¶ 8.

*Discussion*

DA Morgenthau asserts sovereign immunity and the protections of the Eleventh Amendment, and because the Second Circuit has stated that such an assertion "implicates jurisdictional concerns,"[23] DA Morgenthau argues that this Court lacks subject matter jurisdiction to adjudicate this claim. DA Morgenthau's claim to sovereign immunity, in turn, depends on the propriety of his contention that he should be deemed to be a state official—*i.e.*, that claims against him should be deemed to be claims against a state, which is entitled to claim sovereign immunity and Eleventh Amendment protection. As stipulated by the parties, the Court addresses that threshold issue.[24]

### I.

*Applicable Principles*

A. *Eleventh Amendment Immunity Background*

The Eleventh Amendment provides:

"The Judicial Power[25] of the United States shall not be construed to extend to any suit[26] in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[27]

However, the Supreme Court, particularly recently, has construed the Eleventh Amendment in a manner going well beyond the Amendment's express language. Discussing the scope of the Eleventh Amendment, the Supreme Court stated in its 1996 decision in *Seminole Tribe of Florida v. Florida*:[28]

> Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms. That presupposition has two parts: first, that each State is a sovereign entity in our federal system; and second, that [i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent, For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.[29]

---

23. *Hale v. Mann*, 219 F.3d 61, 67 (2d Cir. 2000).

24. In doing so, the Court accepts as true all of the allegations of the complaint. *See In re Falchi*, 1998 WL 274679 (Bankr.S.D.N.Y. May 27, 1998); *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Ltd.*, 775 F.Supp. 101, 103 (S.D.N.Y.1991), *aff'd*, 968 F.2d 196 (2d Cir.1992); *In re 19 Court Street Assoc., LLC*, 190 B.R. 983, 995 (Bankr.S.D.N.Y.1996). The Complaint is to be construed broadly and liberally. *Becker v. Beame*, 454 F.Supp. 867, 867 n. 1 (S.D.N.Y.1978).

25. "Judicial Power" has been construed to extend beyond Article III courts. *Nelson v. La Crosse County Dist. Attorney*, 301 F.3d 820, 827 n. 5 (7th Cir.2002); *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 761, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) (holding that Congress may not use "Article I powers to create court-like administrative tribunals where sovereign immunity does not apply").

26. The term "suit" includes an adversary proceeding in the bankruptcy context. *Nelson*, 301 F.3d at 827 n. 6.

27. U.S. Const. amend. XI (footnotes added).

28. 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

29. *Id.* at 54, 116 S.Ct. 1114 (citations omitted).

Thus, the Supreme Court "has upheld States' assertions of sovereign immunity in various contexts falling outside the literal text of the Eleventh Amendment" [30] to bar suits against a state by its *own* citizens; [31] suits invoking *federal question* jurisdiction; [32] and suits seeking to enforce federal statutes against states in *state* court.[33] Thus, with some exceptions (not argued to be applicable here),[34] the Supreme Court's rulings with respect to state sovereign immunity, articulated most frequently as based on the Eleventh Amendment, bar federal courts from entertaining suits brought by a private party against a state in its own name.

## B. Ability of Local Officials and Entities to Assert Eleventh Amendment Immunity

█ The Eleventh Amendment protects *states*, as do the principles of sovereign immunity. As the Supreme Court held in *Alden*, sovereign immunity "bars suits against States but not lesser entities. The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the state." [35]

█ Those principles carry over to individuals acting on behalf of states or lesser entities. While sovereign immunity can prohibit suits against individuals "if the suits are, in fact, against the State" [36] (such as where a state will have to pay a resulting judgment),[37] it does not prohibit

**30.** *Alden v. Maine*, 527 U.S. 706, 727, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

**31.** *See Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

**32.** *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

**33.** *See Alden*, 527 U.S. at 754, 119 S.Ct. 2240. The fact that such conclusions would not flow from the words of the Eleventh Amendment was recognized and explained by the *Alden* majority. It stated, in that connection:

The Eleventh Amendment makes explicit reference to the States' immunity from suits "commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., Amdt. 11. We have, as a result, sometimes referred to the States' immunity from suit as "Eleventh Amendment immunity." The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.
*Id.* at 712–713, 119 S.Ct. 2240.

**34.** When Congress exercises its enforcement power under § 5 of the Fourteenth Amendment to authorize suits against states by private individuals, a state's Eleventh Amendment protection must give way. And a state may waive Eleventh Amendment protection. The Creditors' Committee does not make either of those contentions here.

**35.** 527 U.S. at 756, 119 S.Ct. 2240.

**36.** *Id.*, citing, *inter alia*, *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. at 270, 117 S.Ct. 2028 ("The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading").

**37.** *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ("Thus the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment"). However, sovereign immunity does not bar actions against state officers for injunctive relief with respect to prospective violations of federal law. *See Alden*, 527

suits against such individuals if they are acting for lesser entities. Thus the Court must determine whether DA Morgenthau, with respect to the challenged action here, was acting as a state or local figure. The question of whether a local figure or entity is properly viewed as an "arm of the state" for Eleventh Amendment purposes is ultimately one of federal law,[38] though matters of state law are taken into account in making that determination.[39]

## II.

### Was DA Morgenthau Acting as a State or Local Figure?

DA Morgenthau makes two, essentially separate, arguments to assert that he was acting as a state, and not a local, figure. First, he argues that in his actions with respect to the fine sought to be recovered by the Creditors' Committee, he was acting in his prosecutorial capacity, and thereby representing the state, and not the county. Second, DA Morgenthau argues that even if he was not acting in a prosecutorial capacity, his office should be considered an "arm of the state," entitled to Eleventh Amendment protection under the Second Circuit's arm-of-the-state doctrine cases.

### A.

### "Prosecutorial Capacity"

■ DA Morgenthau correctly points out, relying on the Second Circuit's 1988 decision in *Baez v. Hennessy* and its progeny,[40] that when a District Attorney in New York is functioning in his prosecutorial capacity, he is deemed to be acting as a representative of the State, and thus is entitled to raise an Eleventh Amendment defense to any claim brought against him in his official capacity. But the Creditors' Committee—relying on the Second Circuit's 1998 decision in *Myers v. County of Orange*,[41] which distinguished *Baez* and its progeny—argues that DA Morgenthau's ability to assert sovereign immunity in his prosecutorial capacity is limited to specific

U.S. at 757, 119 S.Ct. 2240; *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

**38.** *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 430 n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) ("Ultimately, of course, the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law").

**39.** *Id.* ("But that federal question can be answered only after considering the provisions of state law that define the agency's character").

**40.** *See Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir.1988) (in action under 42 U.S.C. § 1983 against Onondaga County and its DA for DA's erroneous preparation of indictment, the DA was entitled to absolute immunity, and the county was not liable; "[w]hen prosecuting a

criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.") (without addressing Eleventh Amendment), *cert. denied*, 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989); *Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir.1993) (in action under 42 U.S.C. § 1983 by survivors of victim of gang violence, against, among others DA Morgenthau and a subordinate for failures to protect victim, claims against DA Morgenthau and his subordinate were barred by Eleventh Amendment; "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi judicial capacity, represents the State not the county"); *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir.1997) (in action under 42 U.S.C. § 1983 by state inmate against, among others, Kings County DAs Hynes and Holtzman, "[t]o the extent [inmate] seeks damages from these appellees in their official capacities, the Eleventh Amendment bars his claims").

**41.** 157 F.3d 66 (2d Cir.1998).

decisions of the DA to prosecute. Thus, the Creditors' Committee argues, because the receipt of the Funds was not a specific decision to prosecute (or presumably, to refrain from prosecution), DA Morgenthau is not able to assert sovereign immunity.

This Court believes that the cases on prosecutorial capacity are not as narrow as the Creditors' Committee argues, but that the Creditors' Committee is nevertheless correct in its contention if the basis for its claims is narrowed to events *following* the structuring of the plea agreement.

At various times, the Second Circuit has been asked to decide whether allegedly wrongful conduct on the part of a district attorney or district attorney subordinate should be deemed to be on behalf of the state, on the one hand, or a county or locality, on the other.[42] As noted, the Second Circuit held in *Baez* that a decision to prosecute was in the first category, on behalf of the state. But in later cases, the Second Circuit held that other acts involving alleged prosecutorial conduct—ignoring evidence of police misconduct and

sanctioning and covering up wrongdoing;[43] failing adequately to train assistant district attorneys to refrain from use of perjured testimony and in complying with their obligation to disclose exculpatory evidence;[44] and imposing, as a matter of office administration, a policy mechanically favoring the account of the first to complain, in a "cross-complaint" situation, without giving primary regard to the particular facts of the case[45]—were *not* exempted under *Baez*. Several held that a district attorney's actions would be deemed to be local action in instances where a district attorney is acting in a managerial capacity.[46] In three cases, the Second Circuit stated, expressly or impliedly, that "*Baez* was 'confined . . . to challenges to specific decisions[s] of the District Attorney to prosecute.' "[47]

In its 1993 decision in *Gan*, the Second Circuit considered the effect of *Baez* on a New York district attorney's ability to assert Eleventh Amendment immunity.[48] There the victim of a robbery, who had

---

**42.** The decisions of the Second Circuit and the district courts with respect to the capacity in which a district attorney acts have usually concerned actions under 42 U.S.C. § 1983. Such decisions have considered district attorney actions in at least two different contexts—in deciding (1) whether a county (as contrasted to the state) is liable for allegedly wrongful conduct on the part of a district attorney or district attorney subordinate, and (2) whether a district attorney (or subordinate) is entitled to the immunities—absolute or qualified immunity—that attach to prosecutorial actions when the defendant is sued in an individual capacity. *See, e.g., Gan*, 996 F.2d at 529 (noting that Eleventh Amendment is applicable, but defenses of privilege are not, when suit against the state official is in an official capacity, and that defenses of privilege are applicable, but the Eleventh Amendment is not, when the suit is in an individual capacity). Though the contexts in which the "prosecutorial capacity" issue was considered were not identical, the Court finds the decisions in both contexts instructive, and sees no basis

for distinguishing between them in analyzing the capacity in which a district attorney acts.

**43.** *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir.1991).

**44.** *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir.1992).

**45.** *Myers*, 157 F.3d at 77.

**46.** *See Myers*, 157 F.3d at 77 (district attorney acting "as the manager of the district attorney's office," and thus as "a county policymaker") (quoting *Walker*, 974 F.2d at 301); *Walker*, 974 F.2d at 301 ("Here, by contrast, Walker is challenging the district attorney's management of the office . . .").

**47.** *Myers*, 157 F.3d at 77 (quoting *Walker*, 974 F.2d at 301); *Walker*, 974 F.2d at 301; *Gentile*, 926 F.2d at 152–3 n. 5.

**48.** *See* 996 F.2d at 535–537.

identified gang members as the robbers, was killed, allegedly by members of the same gang, after discussions with the police and an assistant district attorney concerning threats the victim had received, his level of protection and whether gang members should be arrested. Family members brought a § 1983 action against, among others, DA Morgenthau and the assistant district attorney, for alleged wrongful conduct in failing to take appropriate steps before the murder of the victim—as relevant here, by failing to prosecute the alleged murderer before the crime victim was murdered.

Relying on *Baez,* the Second Circuit held that sued in his official capacity, DA "Morgenthau was ... deemed to be an official of New York State and was entitled to invoke Eleventh Amendment immunity" as to a decision not to bring charges against a suspect.[49] But it further stated that:

> With respect, however, to claims centering *not on decisions whether or not, and on what charges,* to prosecute but rather on the *administration* of the district attorney's office, the district attorney has been treated not as a state official but rather as an official of the municipality to which he is assigned. Where, as to such administrative matters, the district attorney acts as "manager" of the District Attorney's office of one of New York City's constituent counties, he may be considered a munici-

pal policymaker for the City of New York.[50]

It is not clear whether the Second Circuit would still say that *Baez* is limited to decisions whether or not to prosecute (or on what charges), however, as quite a number of recent decisions, in a variety of courts, have found prosecutorial immunity with respect to actions involving prosecutorial discretion going beyond such matters. Though not in the Eleventh Amendment context,[51] these decisions have resulted in prosecutorial immunity with respect to pursuing a civil forfeiture of assets;[52] organizing and evaluating evidence for presentation to the jury;[53] filing a criminal information;[54] participating in a probable cause hearing;[55] and actions taken in connection with a bail application.[56] And significantly here, plea bargains and agreements not to prosecute are also covered by prosecutorial immunity, because they involve the prosecutor's decision not to prosecute in exchange for the defendant's agreement to do something in return.

All of those acts can fairly be characterized as involving the district attorney's prosecutorial judgment as part of the criminal litigation process, as contrasted to exercising administrative responsibilities. But courts have been slow to extend the immunity of a prosecutor "beyond the scope of his or her *litigation-related duties.*"[57] For example, a prosecutor is not entitled to assert absolute immunity when he or she releases information to the

---

**49.** *Id.* at 536.

**50.** *Id.* (citing *Walker,* 974 F.2d at 301) (emphasis added).

**51.** *See* n. 42 above.

**52.** *Mendenhall v. Goldsmith,* 59 F.3d 685, 691 (7th Cir.1995).

**53.** *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

**54.** *Barr v. Abrams,* 810 F.2d 358, 362 (2d Cir.1987).

**55.** *Buckley,* 509 U.S. at 270, 113 S.Ct. 2606.

**56.** *Pinaud v. Suffolk,* 52 F.3d 1139, 1149 (2d Cir.1995).

**57.** *Smith,* 958 F.Supp. at 151 (emphasis added).

press,[58] authorizes or directs the police to use wiretaps,[59] or performs functions normally performed by the police.[60]

■ Thus courts apply a functional approach to determine if the prosecutor is acting "as advocate for the state."[61] Authority in this Circuit and District has recognized boundaries of prosecutorial immunity in an action against a prosecutor in his individual capacity that are strikingly similar to those of a prosecutor attempting to assert Eleventh Amendment immunity in his official capacity.[62] Under the doctrine of prosecutorial immunity, a court will allow a district attorney complete immunity from suit if the challenged conduct is a "traditional function" of a prosecutor as "advocate for the state" or "intimately associated with the judicial phase of the criminal process."[63] On the other hand, when a prosecutor acts in an administrative or investigative capacity, he may not claim absolute prosecutorial immunity.[64]

■ DA Morgenthau argues that he was also acting in his prosecutorial capacity when receiving the Funds from AJ Contracting. The Court disagrees.

The cases discussed above collectively stand for the proposition that DA Morgenthau may assert prosecutorial capacity im-

munity for his actions taken in support of the adversarial process in a judicial-type proceeding. The teaching of those cases is that in deciding to prosecute Uribe and AJ Contracting, in deciding to accept their pleas, and in structuring the plea agreement in the manner he did, DA Morgenthau was acting in a classic prosecutorial capacity.

But with respect to events after DA Morgenthau achieved what he set out to do as a prosecutor—to charge violations of law; to secure guilty pleas; and to put into place obligations as a consequence of those guilty pleas—the operations of the District Attorney's office were administrative matters.[65] After the plea was structured, and the role of the District Attorney's Office was no more than to take the money from AJ Contracting (or, with the benefit of hindsight, AJ Contracting's subcontractors and other creditors), DA Morgenthau was acting essentially as a creditor and in a manner that did not involve his judgment as a prosecutor (or even as a lawyer). Any government employee could have handled the collection of the Funds—not necessarily a lawyer, much less an experienced prosecutor, exercising the prosecutorial judgment and supervisory skills

---

58. *See Buckley*, 509 U.S. at 276–278, 113 S.Ct. 2606; *Powers v. Coe*, 728 F.2d 97, 103 (2d Cir.1984); *Smith*, 958 F.Supp. at 151 (citing *Buckley* and *Powers*).

59. *See Powers*, 728 F.2d at 103; *Smith*, 958 F.Supp. at 151 (citing *Powers*).

60. *See Buckley*, 509 U.S. at 273, 113 S.Ct. 2606; *Smith*, 958 F.Supp. at 151 (citing *Buckley*).

61. *Buckley*, 509 U.S. at 269, 271, 113 S.Ct. 2606 (courts must look to "the nature of the function performed, not the identity of the actor who performed it") (quoting *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)); *East Coast Novelty Co.*

*v. City of New York*, 809 F.Supp. 285, 291 (S.D.N.Y.1992) ("Rather, the appropriate question is: Into what *role* has the prosecutor's responsibilities cast him—that of administrator, investigator, or advocate?") (emphasis in original).

62. *See Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994); *Smith*, 958 F.Supp. at 150–151.

63. *Imbler v. Pachtman*, 424 U.S. 409, 430, 431 n. 33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

64. *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir.1995); *Smith*, 958 F.Supp. at 151.

65. *See Gan*, 996 F.2d at 530–31.

for which the citizens of New York elect their district attorneys.

DA Morgenthau further contends that "even after a conviction is obtained, whenever a District Attorney's actions are linked to upholding the integrity of the criminal judgment, those actions are considered prosecutorial in nature."[66] This is too broad a characterization of the law. While it is true that after conviction or plea agreement there are instances in which a prosecutor is acting in a prosecutorial capacity,[67] the prosecutor must still be acting as "an advocate for the state." In each of *Daloia v. Rose* and *Parkinson v. Cozzolino*, which DA Morgenthau cites in support of his contention, the prosecutor's post-judgment activities involved prosecutorial activities in advocacy roles or in furtherance of the adversarial process, in a parole proceeding and appellate proceeding, respectively. If AJ Contracting had changed its mind and tried to vacate or upset the plea after it was entered, or otherwise sought some kind of post conviction relief such that DA Morgenthau had to litigate in opposition to uphold the criminal judgment, cases of that character might well be applicable. But here that was not the case. His office had to do no more than deposit AJ Contracting's payments, a matter that was wholly divorced from what prosecutors do to uphold the integrity of the criminal judgments they obtain, on appeal or post-conviction.

DA Morgenthau also argues that he was acting in his prosecutorial capacity by ensuring that the obligations of its Plea Agreement were met. This Court once more disagrees, as DA Morgenthau fails sufficiently to parse what the District Attorney's Office did and did not do. The Court does not need to decide, and does not decide, whether its view would be different if payments had not been made and DA Morgenthau had commenced post-plea legal proceedings to secure payment or consequences of non payment; here he had no occasion to do so. The Court has difficulty seeing how the passive receipt of funds by the District Attorney's Office, collecting on an obligation that was already put into place, can in any way be regarded as acting as an advocate for the state.

Thus the Court agrees with the Creditors' Committee's contention that DA Morgenthau was no longer representing the State when the District Attorney's Office accepted the Funds. As the District Attorney's Office was acting in an administrative capacity, DA Morgenthau is not eligible for protection under the Eleventh Amendment.

### B.

### "Arm of the State"

DA Morgenthau also seeks Eleventh Amendment protection based on a second contention, unrelated to prosecutorial activities, and based instead on principles broadly applicable to many different types of governmental or quasi-governmental entities. He relies on the "arm-of-the-state doctrine"[68]—providing that while the

---

66. DA Morgenthau Reply Mem. at 7.

67. *See Daloia v. Rose*, 849 F.2d 74, 75 (prosecutor had absolute immunity with respect to claims in pro se § 1983 action that he presented "false testimony, used a guilty plea allocution for investigative purposes, and transmitted false information to New York State parole authorities"); *Parkinson v. Cozzolino*, 238 F.3d 145, 152 (2d Cir.2001)

(prosecutors had absolute immunity in § 1983 action with respect to their instructions to withhold, as evidence, during pendency of appeal, return of claimant's artificial leg in which a bullet had lodged).

68. *See Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292–293 (2d Cir.1996).

Eleventh Amendment does not ordinarily apply to a suits against a county, municipal corporation or other political subdivision, such a governmental subdivision is entitled to immunity if it can demonstrate that it is acting like "an arm of the state," or "more like an arm of the state," [69] rather than like "a municipal corporation or other political subdivision." [70] Here DA Morgenthau contends that if he is not entitled to assert Eleventh Amendment immunity by reason of prosecutorial capacity, he is entitled to it because the District Attorney's Office was an "an arm of the State" when it received payments of AJ Contracting Funds.

■ Standards for the determination of when a governmental subdivision is an "arm of the state" entitled to Eleventh Amendment protection were set forth most recently in the Second Circuit's 2001 decision in *McGinty v. New York*.[71] There, relying on its earlier decisions in *Feeney v.*

*Port Authority Trans–Hudson Corp.*[72] and *Mancuso*, in 1989 and 1996, respectively, which in turn had been derived from the Supreme Court's 1979 decision in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*,[73] the Second Circuit held that in determining whether an entity is an arm of the state, six factors are initially considered.[74] The factors are:

(1) how the entity is referred to in its documents of origin; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's financial obligations are binding upon the state.[75]

■ The Court also articulated the framework for weighing and evaluating the six factors:

**69.** Some of the cases articulate the standard as acting "as an arm of the state." *See, e.g., Alden*, 527 U.S. at 756, 119 S.Ct. 2240 ("The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State"); *McGinty v. State of New York*, 251 F.3d 84, 95 (2d Cir.2001) ("We pass now to the question of whether defendant Retirement System is an arm of the state"). Other authority articulates it as acting *"more like* 'an arm of the state.'" *See, e.g., Mancuso*, 86 F.3d at 292 ("the Thruway Authority is entitled to immunity if it can demonstrate that it is *more like* 'an arm of the State,' such as a state agency, than like 'a municipal corporation or other political subdivision'") (emphasis added). This Court does not need to determine whether there is any distinction between the two standards, as it concludes, for reasons set forth below, that the District Attorney's Office does not meet either of them.

**70.** *Mancuso*, 86 F.3d at 292.

**71.** 251 F.3d 84 (2d Cir.2001).

**72.** 873 F.2d 628, 630–633 (2d Cir.1989), *aff'd*, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (finding suit against the Port Authority Trans–Hudson ("PATH") transit system, a wholly-owned subsidiary of the Port Authority of New York and New Jersey, permissible under the Eleventh Amendment, by reason of both state statutory waiver permitting suits against the Authority, and because the Port Authority was not a state agency for purposes of the Eleventh Amendment). The Supreme Court affirmed on the first basis, without deciding the second issue. *See* 495 U.S. at 308–309, 110 S.Ct. 1868 ("We conclude that the statutory consent to suit provision, elucidated by the venue provision, establishes the States' waiver of any Eleventh Amendment immunity that might otherwise bar [plaintiff injured employees'] suits against [PATH]").

**73.** 440 U.S. 391, 401–02, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).

**74.** *McGinty*, 251 F.3d at 95–96.

**75.** *Id.*

If these factors point in one direction, the inquiry is complete. If not, a court must ask whether a suit against the entity in federal court would threaten the integrity of the state and expose its treasury to risk. If the answer is still in doubt, a concern for the state fisc will control.[76]

■ While the litigants here do not differ with respect to the applicable factors to be considered, they differ substantially with respect to the factors' application. The Court cannot subscribe fully to either side's application of those factors, and simply sets forth its own view of the application of the arm-of-the-state doctrine to the facts presented here. Such an analysis leads this Court to the conclusion that the District Attorney's Office was not acting as "an arm of the state," and that, at least on the record here, is not entitled to Eleventh Amendment immunity based on such a contention.

### 1. How Referred to in its Documents of Origin

■ The District Attorney's Office was originally considered a "state officer" for some purposes under the New York State Constitution.[77] However, the New York Court of Appeals held in 1982 that "more recent constitutional developments have operated to remove this office from its previous constitutional stature and that a District Attorney may no longer properly be considered a State officer."[78] Even though the entitlement to federal constitutional immunity is ultimately a question of federal law,[79] on matters, like this one, involving state law underpinnings, this

Court necessarily must give the views of the New York courts—at least those of its appellate courts and especially those of its highest court—great weight.

DA Morgenthau argues that *Kelley* should be limited to the facts and issue the New York Court of Appeals there considered—whether a district attorney should be classified as local for purposes of a constitutional prohibition of mid-term salary increases. But this interpretation of *Kelley* is inconsistent with its much broader language:

> The history of the constitutional home rule provisions demonstrates the evolution of county governments from their previous status as administrative arms of the State to their present status *as more autonomous units of local government.* The power granted to counties over the nature and functions of its local offices is a significant one, extending even to the power to abolish those offices under certain circumstances. In determining whether the office of District Attorney is a State or local office, the effect of such changes upon the status of county governments may not be ignored. Indeed, we believe that under the present constitutional framework, *the characterization of a District Attorney as a State officer is conceptually incompatible with the broad authority afforded counties over their local offices by the home rule provisions. Accordingly, we conclude that a District Attorney should no longer be considered a "state officer" within the meaning of section 7 of article XIII of the Constitution.*[80]

---

**76.** *Id.* at 96.

**77.** *See* N.Y. Const. art. XIII, § 7; *Matter of Kelley v. McGee*, 57 N.Y.2d 522, 534–35, 457 N.Y.S.2d 434, 437–438, 443 N.E.2d 908 (1982).

**78.** *Kelley*, 57 N.Y.2d at 534, 457 N.Y.S.2d 434, 443 N.E.2d 908.

**79.** *See* nn. 38 and 39, above.

**80.** *Kelley*, 57 N.Y.2d at 536, 457 N.Y.S.2d 434, 443 N.E.2d 908 (citation omitted) (emphasis added).

The Court of Appeals went on to state in a footnote:

This conclusion is further buttressed by the language of article XIII (§ 13, subd. [c]) of the [New York] Constitution, which states that the City of New York may abolish the "office of any county officer within the city other than judges, clerks of counties and district attorneys". It is certainly worthy of note that the only specific reference in the [New York] Constitution to the nature of the office of District Attorney as State or local is phrased in terms implicitly recognizing its character as local, or county, in nature.[81]

Similarly, New York state statutory law, and case law construing it, reinforces that conclusion. Under New York's Public Officers Law, a District Attorney is classified as "local."[82] In *Fisher v. State of New York*,[83] the New York Court of Appeals so held when affirming the dismissal by the Court of Claims of a suit against the State

of New York based on an assistant district attorney's allegedly tortious presentation of evidence to a grand jury, which ultimately led to the plaintiff's unlawful conviction being set aside. The Court of Appeals there stated:

Appellant's theory that an Assistant District Attorney is a State officer collides head on with [Public Officers Law 2] which defines state officer and local officer. State officer in that section is defined by listing all those who are to be so considered and it does not include prosecutors. Then, in the same section, the term local officer is stated to include every other officer elected by the voters of a part of the State, also every officer of a political subdivision or municipal corporation (a county is a municipal corporation) and every officer limited in the execution of his official functions to a part only of the State. To call an Assistant District Attorney a State officer would be impossible under the terms of

---

**81.** *Id.* at 536 n. 12, 457 N.Y.S.2d 434, 443 N.E.2d 908.

**82.** *See* N.Y. Public Officers Law § 2. It provides:

The term "state officer" includes every officer for whom all the electors of the state are entitled to vote, members of the legislature, justices of the supreme court, regents of the university, and every officer, appointed by one or more state officers, or by the legislature, and authorized to exercise his official functions throughout the entire state, or without limitation to any political subdivision of the state, except United States senators, members of congress, and electors for president and vice-president of the United States. The term "local officer" includes every other officer who is elected by the electors of a portion only of the state, every officer of a political subdivision or municipal corporation of the state, and

every officer limited in the execution of his official functions to a portion only of the state.

*See also Harvey v. Finnick*, 88 A.D.2d 40, 46, 452 N.Y.S.2d 941, 945 (4th Dep't 1982) ("[D]istrict attorney was included within the definition of a 'local officer' contained in section 2 of the Public Officers Law. Therefore, the Legislature has provided specifically that a district attorney is a local officer."); *Ramos v. City of New York*, 285 A.D.2d 284, 303, 729 N.Y.S.2d 678, 693 (1st Dep't 2001) ("After all, a District Attorney historically has been categorized as a local, rather than a State, officer, which is unremarkable in that the District Attorney is elected and compensated by the county's voters and enjoys no extra-county jurisdiction as a result of which a District Attorney's torts are the torts of the county rather than of the State") (citations omitted).

**83.** 10 N.Y.2d 60, 217 N.Y.S.2d 52, 176 N.E.2d 72 (1961).

that statute .... [84]

Thus New York's Constitution, its statutory law, and the decisional law of New York's courts construing these authorities all strongly lead this Court to a view that under the "documents of origin," a district attorney in New York is not considered to be a state officer.[85] This factor weighs against finding his office to be "an arm of the state."

### 2. How Governing Members are Appointed

A district attorney in New York is elected by the electors of his county.[86] However, the Governor has the right to fill vacancies through appointment.[87] Although its relevance under this factor is questionable, a district attorney may be removed from office by the State, acting through the Governor.[88] DA Morgenthau concedes that this factor likely tips against him.[89] The Court shares that view.

### 3. How Entity is Funded

The District Attorney's Office is generally funded from the county treasury.[90] However, district attorneys are also entitled to some funding from the state.[91] DA Morgenthau states (and the Court accepts

as true) that "[f]or the present fiscal year, somewhere between 8% and 9% of DA Morgenthau's budget is financed by these state funds."[92] Thus, although the District Attorney's Office is funded partially by State funds, the great bulk of the funding comes from local sources.

DA Morgenthau cites a 1997 decision from the Western District of New York, *Daniel v. American Board of Emergency Medicine*[93] (where only 3.3% of the defendant's funding was received from the state, and Eleventh Amendment immunity was nevertheless found to exist), to support his contention that an entity can assert Eleventh Amendment immunity even if a low percentage of a budget is funded by the state. This is certainly true, as this element is only one factor to consider under the six-part test. However, in *Daniel*, the many other factors that the court considered in deciding whether the SUNY Stony Brook University Hospital was entitled to assert Eleventh Amendment immunity tipped the balance in favor of allowing the hospital to assert immunity. This Court reads *Daniel* to hold that the Court could nevertheless hold in DA Morgenthau's favor if he were to prevail under the totality of the six-part test, or the "tie-breakers" if

**84.** *Id.* at 61, 217 N.Y.S.2d at 53, 176 N.E.2d 72 (citation omitted).

**85.** DA Morgenthau argues that when he acts in his prosecutorial capacity, he is considered a representative of the State, not the county. Of course this is true, and it is relevant with respect to his first argument, discussed above. However, the Court could not find this distinction in any of the documents of origin—the New York State Constitution, its statutory law, nor the caselaw construing either of them—and DA Morgenthau does not point to any such language. Thus, this argument is irrelevant under this factor of the six-part test.

**86.** N.Y. Const. art. XIII § 13(a); N.Y. County Law § 926(1).

**87.** *Baez*, 853 F.2d at 76–77.

**88.** N.Y. Const. art. XIII §§ 13(a), (b); N.Y. County law §§ 400(7), 926(2).

**89.** DA Morgenthau Reply Mem. at 9.

**90.** *See* N.Y. County Law §§ 705, 928, 933; N.Y.C. Charter § 1125; N.Y.C. Admin. Code § 3–601(b).

**91.** N.Y. Const. art. XIII § 13(b); N.Y. County Law §§ 700(10), 707(3).

**92.** DA Morgenthau Reply Mem. at 10.

**93.** 988 F.Supp. 127, 173–174 & n. 40 (W.D.N.Y.1997).

the test is inconclusive, but not to favor him on application of this factor.

Thus, this factor tips against immunity.

### 4. Whether Entity's Function is Traditionally One of Local or State Government

As DA Morgenthau recognizes,[94] "[a] [d]istrict [a]ttorney's core function is to prosecute crimes within his jurisdiction."[95] But a district attorney does so in the name of "the People of the State of New York." In this respect, and as discussed above, when DA Morgenthau is acting in his "prosecutorial capacity," he is serving a function of the State.[96] However, DA Morgenthau has not argued that he can exercise his authority on a statewide basis, and his accountability to the public has historically been local.

In *Kelley*, the New York Court of Appeals recognized the evolution of county governments in New York from their previous status as administrative arms of the State to their present status as more autonomous units of local government with broad authority over their local offices.

DA Morgenthau's core function, his inability to exercise authority on a statewide basis, and his local status under New York state law dramatically outweigh, in this Court's view, his localized representation of the "People of the State of New York." In this Court's view, this factor, rather strongly, tips against immunity.

### 5. Whether State has Veto Power Over Entity's Actions

The application of this factor is rather complex. District attorneys in New York act with a great deal of autonomy—which is fully consistent with their accountability to the voters on a local basis, and potential local preferences with respect to prosecutorial philosophy and priorities, and allocation of available prosecutorial resources. But in *Matter of Johnson v. Pataki*,[97] the New York Court of Appeals held that if the Governor disagrees with a district attorney's decision as to whether or how to prosecute a suspected offender, the Governor may supersede the district attorney with respect to that prosecution, and cause the New York Attorney General to prosecute it on behalf of the State.[98] In such event, judicial review of the Governor's decision is limited to determining whether the New York Constitution or Legislature has empowered the Governor to act,[99] effectively making unreviewable lawful discretionary actions by the Governor to supersede the district attorney. The superseder power is not frequently exercised, but its exercise as litigated in *Matter of Johnson* was not the first time. As the Court of Appeals there noted, "Governors have numerous times invoked the superseder power."[100]

By reason of that power to supersede, the State ultimately has a kind of veto power. But it is a veto power not over the local district attorney's decision, but an indirect veto power, by depriving the local

---

**94.** DA Morgenthau Reply Mem. at 10.

**95.** *See* N.Y. County Law §§ 700(1), 927.

**96.** *People v. Dunlap*, 216 A.D.2d 215, 217, 629 N.Y.S.2d 407 (1st Dep't 1995) (stating that a district attorney acts as a "State officer" in prosecuting crimes).

**97.** 91 N.Y.2d 214, 668 N.Y.S.2d 978, 691 N.E.2d 1002 (1997).

**98.** *Id.* at 226–228, 668 N.Y.S.2d at 983–84, 691 N.E.2d 1002.

**99.** *Id.* at 223, 668 N.Y.S.2d at 981, 691 N.E.2d 1002. *See* Executive Law § 63(2); N.Y. Const. art. IV § 3.

**100.** 91 N.Y.2d at 224, 668 N.Y.S.2d at 981, 691 N.E.2d 1002 (citation omitted).

district attorney of the continuing power to act. And in matters relating to the administration and management of the District Attorney's Office—such as hiring and firing of staff—the State has no power to interfere at all.[101]

On balance, and though the matter is close to a wash, the Court finds that this factor slightly favors DA Morgenthau's position that he is an arm of the State.

### 6. Whether Entity's Financial Obligations are Binding on the State

Under this factor, the relevant question is "whether a judgment against the [District Attorney's Office] would have the practical effect of requiring payments from New York."[102] Upon questioning by the Court at oral argument, counsel for DA Morgenthau acknowledged that the Funds paid by AJ Contracting were used for local purposes, and did not contend that if this Court were to order their return, the payment would come from the State. This response, on what the Court considers to be one of the most important factors, is significant to the Court.

Nevertheless, as noted above, between 8% and 9% of the District Attorney's Office's budget is financed by state funds. Thus DA Morgenthau argues that "those state monies are at risk in this litigation, and plaintiffs are therefore mistaken in asserting that an adverse judgment 'will not result in a depletion of state funds.'"[103] But in this Court's view, such an argument stretches the standard of "putting the state's treasury at risk" too far. If the Court were to accept that argument, nearly any entity receiving state assistance or funding, even if wholly

unrelated to the litigation judgment to be satisfied, would be able to assert Eleventh Amendment immunity—notwithstanding the many holdings (some but much fewer than all of which were noted above) that have recognized that local governmental subdivisions, unless they are "arms of the state," do not qualify for Eleventh Amendment protection.

■ The Court does not believe that this is what the *Mancuso* and *McGinty* courts had in mind under this element of the six-part test. Those courts were concerned with whether or not the State would be "on the hook" if the local entity lost the particular litigation in which the local entity was attempting to claim Eleventh Amendment immunity. That requires, at the least, some kind of nexus (*e.g.*, a duty under respondeat superior, or under other state law, or contractually, for indemnification or contribution) between the cause of action being asserted and the State's duty to pay. Such a nexus is conspicuously absent here.

Here there has been no showing that the State would have to pay or indemnify any judgment, nor that the State would have to pay any more to or for the benefit of DA Morgenthau's office, even for general funding, if he were to lose this litigation. This factor weighs, strongly, against a finding that DA Morgenthau's office is an "arm of the state."

\* \* \*

*McGinty* tells us that "[i]f these factors point in one direction, the inquiry is complete." Overall, they plainly do. Five of the six factors weigh against DA Morgenthau's position. And while the sixth (veto power) weighs slightly in his favor, on the whole the balancing dramatically tips to-

---

**101.** DA Morgenthau Opening Br. at 12; DA Morgenthau Reply Br. at 11.

**102.** *See McGinty,* 251 F.3d at 99 (quoting *Mancuso*); *Mancuso,* 86 F.3d at 296.

**103.** DA Morgenthau Reply Mem. at 11, quoting Creditors' Committee Mem. at 12.

ward the conclusion that the District Attorney's Office is not at all an arm of the state, much less "more" of one.

But assuming, without deciding, that even a dramatic tipping in one direction is not decisive, the Court looks to the *McGinty* tie-breakers—whether the litigation in question would threaten the integrity of the State, or expose it to financial risk. Here the Court sees no such danger. This is a strictly local matter, where DA Morgenthau's law enforcement function has been completed. The satisfactory performance of his duties in that respect is undisputed. At this point, this matter involves no more than a controversy that is frequent, to say the least, in disputes in bankruptcy court: the allocation of loss between two innocent sides—the District Attorney's Office, on the one hand, and AJ Contracting's subcontractors and other creditors, on the other—where the available assets are insufficient to satisfy both sides' needs and concerns.[104] Neither the integrity of the State, nor financial risk to it, is involved in any way; the State is in every respect a bystander to this controversy. The Court finds that under the *McGinty* six-part test, or its tie-breakers, if necessary, the District Attorney's office is a local, and not a state, entity.

### Conclusion

For the foregoing reasons, DA Morgenthau's motion for an order pursuant to Fed.R.Civ.P. 12(b)(1) dismissing the Complaint for lack of subject matter jurisdiction is denied.

SO ORDERED.

---

**104.** The Court makes these observations only to address a possible contention that this ruling would threaten the integrity of the State. It declines to base any part of its decision on this motion, as the Creditors' Committee argues and DA Morgenthau opposes, on notions of "equity," or on which party has a more legitimate claim to the Funds. That is a matter of law, not equity, and it is not yet before the Court.